**KESSLER TOPAZ MELTZER**
**  & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001

*Liaison Counsel for Plaintiff City of Hialeah*
*Employees' Retirement System*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>     v.<br><br>SUPER MICRO COMPUTER, INC., CHARLES LIANG, DAVID WEIGAND, and YIH-SHYAN "WALLY" LIAW,<br><br>        Defendants. | Case No. 5:26-cv-03018<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 3

III.    PARTIES ............................................................................................................. 3

        A.      Plaintiff .................................................................................................. 3

        B.      Defendants ............................................................................................. 3

IV.     BACKGROUND ................................................................................................. 4

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        CAUSE SUBSTANTIAL LOSSES TO INVESTORS ....................................... 5

VI.     THE TRUTH EMERGES .................................................................................... 9

VII.    LOSS CAUSATION .......................................................................................... 10

VIII.   CLASS ACTION ALLEGATIONS .................................................................. 10

IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR .............................. 11

X.      PRESUMPTION OF RELIANCE ..................................................................... 12

XI.     SCIENTER ALLEGATIONS ........................................................................... 13

XII.    CLAIMS FOR RELIEF ..................................................................................... 14

COUNT I ...................................................................................................................... 14

COUNT II ..................................................................................................................... 15

XIII.   PRAYER FOR RELIEF .................................................................................... 16

XIV.    JURY DEMAND ............................................................................................... 16

Plaintiff City of Hialeah Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, inter alia, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Super Micro Computer, Inc. ("Super Micro" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Super Micro; and (d) other public information regarding the Company.

## I.    INTRODUCTION

1.    Plaintiff brings this securities class action on behalf of all persons or entities that purchased or otherwise acquired Super Micro common stock between February 2, 2024, and March 19, 2026, inclusive (the "Class Period").  The claims asserted herein are alleged against Super Micro and certain of the Company's senior officers (collectively, "Defendants") and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.    Super Micro is a technology company that designs, builds, and sells high-performance servers, data storage systems, and related hardware used by businesses for applications such as cloud computing, artificial intelligence ("AI"), and managing large-scale data centers.  The vast majority of Super Micro's revenues are derived from the sale of servers, many of which integrate chips manufactured by Nvidia Corporation ("Nvidia").

3.    Beginning in 2022, the U.S. Department of Commerce implemented license requirements for the export and reexport of certain technologies to China and Hong Kong, effectively barring these sales.  These regulations reflect a determination by the U.S. government that the computing capabilities in advanced AI accelerator hardware are of sufficient strategic significance that their transfer to China poses an unacceptable risk to national security.  Among the technologies subject to the export controls are certain chips manufactured by Nvidia.

4.    Throughout the Class Period, Defendants expressly stated that Super Micro "follows all U.S. export control requirements on the sale and export" of Nvidia chips.  Further,

Defendants represented that sales to China accounted for around 1% of its revenues and that its revenue growth was being driven by its "technology and product leadership in the AI infrastructure market." Defendants also purported to warn that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties." As a result of these representations, the price of Super Micro common stock traded at artificially inflated prices throughout the Class Period.

5.      Defendants' Class Period representations were false.  In truth, Super Micro and one of its former board members intentionally flouted export control rules and rerouted billions of dollars' worth of servers incorporating advanced Nvidia chips into China in violation of U.S. law. Moreover, Super Micro's sales growth was driven, in part, by the fact that it was illegally selling products into the Chinese market.

6.      The truth emerged on March 19, 2026, after the market closed, when federal agents arrested Super Micro co-founder, board member, and Senior Vice President of Business Development, Defendant Yih-Shyan "Wally" Liaw.  Shortly thereafter, the Department of Justice unsealed an indictment charging Liaw and two other individuals for allegedly conspiring to divert Super Micro computer servers integrating sophisticated AI technology to China, in violation of the export control rules which prevent such sales without a license (the "Indictment").  The Indictment alleged that, beginning in or about 2024, the indicted individuals participated in a scheme that "caused the sale of at least approximately $2.5 billion worth" of Super Micro servers to a passthrough company in Southeast Asia, the majority of which were ultimately diverted to China. As a result of these disclosures, Super Micro's stock price declined by $10.26 per share, or 33%.[1]

7.      As a result of Defendants' actions detailed herein, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

---

[1] On September 30, 2024, after market close, Super Micro effected a ten-for-one forward split of the Company's common stock, par value $0.001 per share, without any change to its par value. All prices and share counts referenced in this Complaint are post-split.

## II.   JURISDICTION AND VENUE

8.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.   Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Super Micro's principal executive office is located in San Jose, California, which is situated in this District, and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.   Plaintiff

10.   Plaintiff City of Hialeah Employees' Retirement System is a benefit pension plan based in Hialeah, Florida that provides pension services and benefits to employees, retirees, and beneficiaries of the City of Hialeah.  As indicated in the certification submitted herewith, Plaintiff purchased Super Micro common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.   Defendants

11.   Defendant Super Micro is a technology company that designs and manufactures, among other things, high-performance servers and data storage systems.  The Company maintains its headquarters at 980 Rock Avenue, San Jose, California.  Super Micro common stock trades on NASDAQ under the ticker symbol "SMCI."  As of January 31, 2026, Super Micro had nearly 599 million shares of common stock outstanding, owned by thousands of investors.

12.    Defendant Charles Liang ("Liang") is, and was at all relevant times, Super Micro's Chief Executive Officer, Chairman of the Company's Board of Directors, and the President of the Company.

13.    Defendant David Weigand ("Weigand") is, and was at all relevant times, Super Micro's Chief Financial Officer.

14.    Defendant Yih-Shyan "Wally" Liaw ("Liaw") is, and was at all relevant times, Super Micro's co-founder, a member of the Company's Board of Directors, and the Senior Vice President of Business Development.

15.    Defendants Liang, Weigand, and Liaw are collectively referred to herein as the "Officer Defendants."  The Officer Defendants, because of their positions with Super Micro, possessed the power and authority to control the contents of Super Micro's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

IV.    **BACKGROUND**

16.    Super Micro is a technology company that designs, builds, and sells high-performance servers, data storage systems, and related hardware used by businesses.  The vast majority of Super Micro's revenues are derived from sales of servers integrating Nvidia chips, due in part to the Company's strategic "first-to-market" partnership with Nvidia, which allows it to ship the latest Graphics Processing Unit architectures ahead of traditional competitors.

17.    In October of 2022, the Bureau of Industry and Security of the Department of Commerce published a rule introducing restrictions on the export or reexport of advanced computing chips, such as Nvidia's, and semiconductor manufacturing items to China and Hong

Kong.  Under this rule, the export of such technology to China or Hong Kong required a license, applications for which were reviewed under a presumption of denial.  This effectively barred high-end AI chips, such as those contained in many of Super Micro's servers, from reaching Chinese buyers.

18.     These new export control rules were part of an effort to protect U.S. national security and foreign policy interests.  The Bureau of Industry and Security explained that the export controls were imposed to restrict China's ability "to produce advanced military systems including weapons of mass destruction; improve the speed and accuracy of its military decision making, planning, and logistics, as well as of its autonomous military systems; and commit human rights abuses."

19.     At the time these restrictions were introduced, Defendant Weigand told investors that "China sales last quarter were less than 3%.  So we don't consider this to be a significant issue for us going forward."

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

20.     The Class Period begins on February 2, 2024, when Super Micro submitted to the SEC its Form 10-Q for its fiscal year 2024 second quarter.  The Form 10-Q was signed by Defendants Liang and Weigand and contained certifications from Defendants Liang and Weigand attesting the accuracy of the Company's financial statements.  The Form 10-Q incorporated by reference Part I, Item 1A "Risk Factors" of Super Micro's 2023 10-K, including a statement purporting to warn investors that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

21.     On April 23, 2024, *Reuters* reported that Chinese universities and research institutes recently obtained high-end Nvidia AI chips despite the export restrictions on the technology. According to the article, tender documents showed that Chinese companies obtained the chips embedded in server products made by Super Micro and other server manufacturers.  *Reuters* reported that "Super Micro said it complied with U.S. requirements on the sale and export of

[Graphics Processing Unit] systems to regions and parties that require licenses." It further quoted the Company as saying: "If we become aware that a third party has exported or reexported without the required licenses, we investigate the matter and take appropriate action." Additionally, the article quoted a letter sent to Reuters by law firm Clare Locke on behalf of Super Micro, which stated that Super Micro "goes above and beyond what U.S. export restrictions require" by proactively taking steps to ensure its customers do not violate the curbs.

22. On May 6, 2024, Super Micro submitted to the SEC its Form 10-Q for its fiscal year 2024 third quarter. The Form 10-Q was signed by Defendants Liang and Weigand and contained certifications from Defendants Liang and Weigand attesting the accuracy of the Company's financial statements. The Form 10-Q incorporated by reference Part I, Item 1A "Risk Factors" of Super Micro's 2023 10-K, including a warning to investors stating "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

23. On August 6, 2024, Super Micro filed with the SEC its results of operations and financial condition on Form 8-K, in which Defendant Liang stated, "Supermicro continues to experience record demand of new AI infrastructures propelling fiscal 2024 revenue up 110% year over year to $14.9 billion and non-GAAP earnings per share up 87% to $22.09."

24. On August 12, 2024, *The Information* published an article titled "Nvidia AI Chip Smuggling to China Becomes an Industry" reporting on the growth of the AI chip smuggling industry, which quoted from a statement by a spokesperson for Super Micro responding to the article. In pertinent part, Super Micro stated that it "follow[s] all US export control requirements on the sale, service, support, and export of [Graphics Processing Unit] systems to regions and parties that require licenses under the Export Administration Regulations."

25. On December 19, 2024, both *Reuters* and *The Information* reported that Nvidia had asked its large distributors, including Super Micro, to conduct spot checks of their customers in Southeast Asia to verify that those customers were still in possession of the servers equipped with Nvidia chips and had not sold them on to China. This request was prompted by an inquiry by the Department of Commerce, which had asked Nvidia to review how its AI chips were being

smuggled into China despite the export controls. Super Micro provided statements to both news outlets stating that it "follows all U.S. export control requirements on the sale and export" of Nvidia chips and that if the Company becomes "aware that a third party has exported or reexported without the required licenses, we investigate and take appropriate action."

26. Additionally, in December 2024, Super Micro published an Export Compliance Policy on its website, which stated that it was the Company's policy to "fully comply with all export and re-export control laws of the United States." It further clarified that the "guidelines, practices and supporting documentation discussed herein apply to all [Super Micro] export or re-export activities subject to U.S. export control laws." The Export Compliance Policy stated that "[a]ll [Super Micro] employees are responsible for complying with this policy."

27. On February 25, 2025, Super Micro filed with the SEC its annual report on Form 10-K for its fiscal year 2024, delayed from the year prior. The Form 10-K was signed by Defendants Liang, Weigand, and Liaw, and contained certifications from Defendants Liang and Weigand attesting the accuracy of the Company's financial statements. The 2024 Form 10-K purported to warn that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

28. On May 6, 2025, Super Micro held an earnings call with analysts and investors to discuss the Company's financial results for the third quarter of fiscal 2025. During this earnings call, Defendant Weigand continued to downplay the amount of revenues derived from sales to China, stating that "China continued to represent less than 1% of sales in Q3."

29. On May 12, 2025, Super Micro submitted to the SEC its Form 10-Q for the fiscal year 2025 third quarter. The Form 10-Q was signed by Defendants Liang and Weigand and contained certifications from Defendants Liang and Weigand attesting the accuracy of the Company's financial statements. The Form 10-Q incorporated by reference Part I, Item 1A "Risk Factors" of Super Micro's 2024 10-K, including a warning to investors stating "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

30. On August 5, 2025, Super Micro held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2025 fourth quarter. During this earnings call, Defendant Liang reported "47% year-on-year revenue growth at $22 billion," which he attributed to "strong demand for our AI and green computing solutions."

31. On August 28, 2025, Super Micro filed with the SEC its annual report on Form 10-K for its fiscal year 2025. The Form 10-K was signed by Defendant Liang, Weigand, and Liaw, and contained certifications from Defendants Liang and Weigand attesting the accuracy of the Company's financial statements. The 2025 Form 10-K purported to warn that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

32. On November 7, 2025, Super Micro submitted to the SEC its Form 10-Q for the fiscal year 2026 first quarter. The Form 10-Q was signed by Defendants Liang and Weigand and contained certifications from Defendants Liang and Weigand attesting the accuracy of the Company's financial statements. The Form 10-Q incorporated by reference Part I, Item 1A "Risk Factors" of Super Micro's 2025 Form 10-K, including a warning to investors stating "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

33. On February 6, 2026, Super Micro submitted to the SEC its Form 10-Q for its fiscal year 2026 second quarter. The Form 10-Q was signed by Defendants Liang and Weigand and contained certifications from Defendants Liang and Weigand attesting the accuracy of the Company's financial statements. The Form 10-Q incorporated by reference Part I, Item 1A "Risk Factors" of Super Micro's 2025 10-K, including a warning to investors stating "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

34. The statements in paragraphs 20-33 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Defendant Liaw, a senior executive at Super Micro and member of the Company's Board of Directors, had orchestrated a scheme to

intentionally divert billions of dollars' worth of Super Micro servers to China in violation of the export control rules. In addition, Super Micro's sales growth over the Class Period was driven, at least in part, by its sales of servers to China in violation of U.S. export controls, which accounted for significantly more than 1% of the Company's revenues. In addition, to the extent the Company purported to warn of risks regarding the violation of export controls, Defendants omitted that such risks had already begun to materialize.

## VI.    THE TRUTH EMERGES

35.    The truth emerged on March 19, 2026, after the market closed, when a federal court unsealed the Department of Justice Indictment charging Super Micro co-founder, Liaw, and two other individuals connected to Super Micro with allegedly conspiring to divert Super Micro servers containing advanced Nvidia AI chips to China, in violation of U.S. export control laws. Defendant Liaw and one of his co-conspirators were also arrested that same day.

36.    The unsealed Indictment alleges that, beginning in or about 2024, the indicted individuals participated in a scheme that "caused the sale of at least approximately $2.5 billion worth" of Super Micro servers to a passthrough company in Southeast Asia, the majority of which were ultimately diverted to China. The Indictment alleges that the scheme ramped up over time, and that between late April 2025 and mid-May 2025 alone, at least approximately $510 million worth of Super Micro servers, assembled in the United States, were diverted to China in violation of U.S. export control laws.

37.    The Indictment alleges that Defendant Liaw and his co-conspirators directed certain executives of the passthrough company to place purchase orders with Super Micro for servers containing certain AI chips, purportedly for its own use. The passthrough company, in consultation with the indicted individuals, then repackaged the Super Micro servers and placed them in unmarked boxes to conceal their content prior to shipping them to their final destinations in China. Defendant Liaw and his co-conspirators allegedly went to great lengths to conceal their scheme, including the fabrication of false records and documents, and the staging of "dummy" servers to fool inspections of the passthrough company. In the aftermath of the unsealing, Super Micro announced that it placed Defendant Liaw and the other employee co-conspirator on

administrative leave and had terminated its relationship with the third individual, who was a contractor. These disclosures caused the price of Super Micro shares to decline by $10.26 per share, or 33%, from a closing price of $30.79 on March 19, 2026, to a closing price of $20.53 on March 20, 2026.

## VII.    LOSS CAUSATION

38.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. These misleading statements and omissions artificially inflated the price of Super Micro common stock and operated as a fraud or deceit on the Class (as defined below). Later, when the alleged misrepresentations and fraudulent conduct were disclosed to the market after market close on March 19, 2026, the price of Super Micro common stock fell precipitously. As a result of their purchases of Super Micro common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.    CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Super Micro common stock during the Class Period (collectively, the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Super Micro and their families and affiliates.

40.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of January 31, 2026, Super Micro had nearly 599 million shares of common stock outstanding, owned by thousands of investors.

41.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Officer Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether the Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Super Micro common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

42.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

43.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

45.     Super Micro's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

46.     The Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Super Micro who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan,

projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.      PRESUMPTION OF RELIANCE

47.      At all relevant times, the market for Super Micro common stock was an efficient market for the following reasons, among others:

(a)      Super Micro common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)      As a regulated issuer, Super Micro filed periodic public reports with the SEC and NASDAQ;

(c)      Super Micro regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      Super Micro was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

48.      As a result of the foregoing, the market for Super Micro common stock promptly digested current information regarding Super Micro from all publicly available sources and reflected such information in the price of Super Micro common stock.  Under these circumstances, all purchasers of Super Micro common stock during the Class Period suffered similar injury through their purchase of Super Micro common stock at artificially inflated prices and the presumption of reliance applies.

49.      A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Super Micro's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the significance of Super Micro's compliance with United States export control requirements on the sale and export of Nvidia chips, that requirement is satisfied here.

## XI.    SCIENTER ALLEGATIONS

50.      As alleged herein, the Defendants acted with scienter since the Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Numerous facts including those detailed above, considered collectively, demonstrate that Defendants knew or recklessly disregarded that they were misrepresenting the Company's compliance with United States export control requirements on the sale and export of Nvidia chips.

51.      According to the Indictment, Defendant Liaw was intimately involved in orchestrating the scheme to subvert export controls and smuggle banned Nvidia chips into China.  The Indictment makes reference to text messages between Defendant Liaw and the employees at the Southeast Asian passthrough company directing them to make purchases of Super Micro servers for diversion to China, and to have purported data center lease agreements in place "in case [of an] audit later."  Additionally, Defendant Liaw received photographs of the dummy servers staged.  Scienter is further supported by Defendant Liaw's "resignation" the day after he was arrested.

52.      Further, given the repeated reports of Super Micro servers containing Nvidia AI chips being reexported to China, including the December 2024 request from Nvidia for Super

Micro to verify that its customers in Southeast Asia still had possession of their servers, the Officer Defendants were at minimum reckless in providing assurances to investors that they were in compliance with U.S. export control laws.

53. Collectively, these facts give rise to a strong inference of scienter.

## XII.    CLAIMS FOR RELIEF

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

### (Against All Defendants)

54. Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

55. During the Class Period, the Defendants carried out a plan, scheme, and course of conduct which intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Super Micro common stock at artificially inflated prices.

56. The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57. The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

58. During the Class Period, the Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59. The Defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or recklessly disregarded the true facts that were available to them. The Defendants engaged in this misconduct to conceal Super Micro's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

60.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Super Micro common stock at artificially inflated prices and were harmed when the truth about Super Micro negatively impacted the price of the Company's common stock.  Plaintiff and the Class would not have purchased Super Micro common stock at the prices they paid, or at all, had they been aware that the market prices for Super Micro common stock had been artificially inflated by the Defendants' fraudulent course of conduct.

61.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

62.    By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act

### (Against the Officer Defendants)

63.    Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

64.    The Officer Defendants acted as controlling persons of Super Micro within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Super Micro, the Officer Defendants had the power and ability to control the actions of Super Micro and its employees.  By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

## XIII.    PRAYER FOR RELIEF

65.    WHEREFORE, Plaintiff prays for judgment as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIV.    JURY DEMAND

66.    Plaintiff demands a trial by jury.

DATED: April 8, 2026

Respectfully submitted,

**KESSLER TOPAZ MELTZER
& CHECK, LLP**

*/s/ Jennifer L. Joost*
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001

*Liaison Counsel for Plaintiff City of Hialeah
Employees' Retirement System*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
Hannah Ross
(hannah@blbglaw.com)
Scott R. Foglietta
(scott.foglietta@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Plaintiff City of Hialeah Employees' Retirement System*

**KLAUSNER KAUFMAN JENSEN & LEVINSON, P.A.**
Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, FL 33315
Telephone: (954) 916-1202
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Plaintiff City of Hialeah Employees' Retirement System*